CHARLES LIESKE et al., Appellees, v. IOWA CHILDREN'S HOME SOCIETY, Appellant.

**PARENT AND CHILD:** Custody of Child—Order of Surrender—Effect. Natural parents who, by reason of their own dereliction, have been legally deprived of all custody and control of their children, are not entitled to know the whereabouts of such children

after such children have been permanently or tentatively adopted by foster parents.

*Appeal from Polk District Court.*—James C. Hume, Judge.

June 22, 1923.

Suit in equity, to compel defendant, a home-finding association for children, to disclose to plaintiffs the whereabouts of three minor children of plaintiffs', who had been taken from them by order of a mayor's court, committed to defendant, and by defendant placed in private homes. A demurrer to petition was overruled, and defendant stood on its demurrer. Decree was entered as prayed, from which decree this appeal is taken.— *Reversed and remanded.*

*Dunshee & Brody,* for appellant.

*Reed Babcock,* for appellees.

Arthur, J.—The issues are presented in the petition and demurrer. In substance, the petition alleges that plaintiffs are husband and wife; that defendant is a society legally incorporated under the laws of Iowa for the purpose of receiving and caring for and placing out for adoption friendless and abandoned children, and operating under the provisions of Chapter 8-A, Title XVI, Supplement to the Code, 1913, with its place of business at Des Moines; that there have been born to plaintiffs five children, three of whom are involved in this action, namely, Charles Lieske, aged, when this action was begun, in June, 1921, 12 years, William Lieske, aged 10 years, and Henry Lieske, aged 5½ years; that, by virtue of a proceeding before the mayor of the city of Sheldon, Iowa, had under Chapter 8-A, Title XVI, Supplement to the Code, 1913, said Charles Lieske and William Lieske and Henry Lieske were committed, on the 28th day of July, 1916, to the care and custody of defendant; that plaintiffs are informed by defendant that Henry Lieske has been adopted, and that Charles Lieske and William Lieske have been placed in private homes, and have either been adopted or have been so placed in private families for the purpose of adoption at a later date; that plaintiffs have repeatedly requested and made demand upon defendant to divulge the where-

abouts and present names and residences of said children; but that said demands have been refused. Plaintiffs pray decree requiring defendant to divulge and make known to plaintiffs the present names, names of adoptive and foster parents, and present residences and addresses of the said three children.

Certain correspondence is made a part of the petition, the substance of the letters being as follows: A. T. Burnell, superintendent of defendant society, wrote to Mr. Charles Lieske:

"Answering yours just at hand inquiring about your boys, would say that all three of them are in splendid homes and doing well in every way. Henry is adopted and his adoptive parents say he is the finest boy in the state. They love him dearly and will give him good advantages. William is doing fine and is having splendid care, attends school regularly. Charlie also has a good home, is regular in school as well as church and Sunday School. His foster parents seem very fond of him. You have no cause to worry over these boys for they are tenderly cared for. We cannot tell you where the boys are as this is strictly against our rules and would only make trouble. The court gave them to us to find good homes for—which we have done—and we will continue to look after their welfare."

C. A. Babcock, attorney for plaintiffs, wrote to A. T. Burnell, superintendent of defendant, stating that said children were committed to defendant society by the mayor of Sheldon, Iowa, and that he had been employed by the parents to see if something could be done so that the parents would at least know where the children are, so that they could hear directly from the children; that he had before him a letter from Burnell, superintendent, saying, "We cannot tell you where the boys are as this is strictly against our rules and would only make trouble;" that the defendant society "is a very benevolent institution,—it ought not to do so cruel a thing as to keep the natural parents of the children in its charge totally ignorant as to their whereabouts. I admit that to let the parents know where their children are would sometimes 'make trouble,' but the breaking of all home ties between parents and children so that they are practically dead to one another, will, in the long run, make much more 'trouble.' Now, in this case, if these parents can be permitted to correspond with their said children, I think they will

be satisfied to let the matter rest there; but if this much cannot be conceded them, they will have to see what can be done in the premises.''

Answering the letter from Babcock, Burnell, superintendent, wrote:

''We regret we are unable to comply with the request that Charles Lieske be informed of the whereabouts of the children * * *. You think of its being 'cruel to keep the natural parents of the children totally ignorant as to their whereabouts.' To do otherwise would be cruel to the children. * * * All I can say is that we are reporting these children well and well cared for, and this report of a general nature should satisfy the parents. * * * We consider first and foremost the welfare of the child, and it would not do at all to have: the parents in direct correspondence with the children, or with others in the vicinity where the children live, or to have them visiting the children. It all leads to one and the same thing—discontent, not only of the children, but those who are trying to do their best for them.''

I.  Proceedings were instituted before F. L. Myers, mayor of the city of Sheldon, by information or affidavit, stating that Charles Lieske, William Lieske, and Henry Lieske, children of Charles Lieske and Bessie Lieske, were ''illtreated and neglected children.'' Date was set for hearing and notice of such hearing served on the parents. Upon the hearing, on July 28, 1916, the mayor found that the complaint was fully established, and that the welfare of said children demanded that action be taken in their behalf, and:

''Ordered and adjudged, under the authority vested in the court by the statutes, that said minor children, Charles Lieske, William Lieske, and Henry Lieske, be, and they are hereby, given into the care and custody of the Iowa Children's Home Society, for placement in a family home, selected and approved according to the usual plans and methods of said society, which is an organization operating under the provisions of Chapter 8-A, Title XVI, of the Code of Iowa, and approved by the board of control of state institutions, for the reception of children committed under the Juvenile Court Law. And the said Iowa Children's Home Society is hereby made and constituted the legal guardian of the person of said children, and given and

authorized· and empowered to exercise all· the rights and authority of the parents of said children, as provided by said statute.''

Section 3260-d, Code Supplement, 1913, provides:

''Whenever it shall be made .to appear to any court, judge, mayor or justice of the peace, as above provided, that any ·child within its jurisdiction, by reason of orphanage, or neglect, * * * is abandoned, illtreated, or friendless, * * * then it shall be the duty of such court or magistrate to take such child away ·from its parents or those having control thereof, ·and commit it to some society incorporated for that purpose,'' etc.

Section 3260-b provides:

''Any society legally incorporated under .the laws of the state of Iowa for the purpose of receiving, caring for, placing out for adoption, or in any way improving the condition of abandoned, abused, illtreated, friendless, or ·orphan children, may receive, control and dispose of such minor children under the provisions of this act; and such corporation shall be the legal guardian of the persons of all children so surrendered to it, and may exercise all the rights and authority of the parents of such children in regulating the apprenticing and adoption thereof.''

II.   The trial court succinctly stated the issue in the case as follows:

''There is no claim made by the plaintiffs in the case at bar that their minor children are illegally restrained.  The claim is that the· children are hidden from them, and all that they ask is for the court to· compel the defendant· to reveal their children's whereabouts,—bill of discovery, as it were.''

The record shows that, in pursuance of the order of the mayor entered on July 28, 1916, the children were placed in the lawful custody of the appellant society.  Afterwards, the defendant society placed the children in private homes.  Henry was adopted by some person; Charles and William have been placed in private homes.  The record is not clear as to whether or not they were adopted.  Appellees do not know with whom the children are living and where they are located.

The concrete question before us is:  Are appellees, the natural parents of these children, who have been deprived of the custody of these children in lawful manner, as provided by

our statutes, and whose children have been placed in the lawful custody of adoptive or foster parents, entitled to an order or decree requiring the defendant society "to divulge and make known to plaintiffs" the present names, names of adoptive and foster parents, and present residences and addresses of the said children?

The manifest purpose of the prayer of the petition is to enable appellees to communicate with the children. The question presented is indeed perplexing. The children are not now in direct charge of the defendant society. The custody and control of the children have passed to others. The pleadings disclose that the defendant society, through its superintendent, knows where the children are. While the society does not have direct charge of the children, it is able to furnish the information sought by appellees. The adoptive or foster parents are not parties to the action, and were not before the court. The record is silent as to their wishes and desires in the premises, except that the arguments of counsel proceed on the theory, and we will assume, that they are in accord with the position taken by the defendant society, and are averse to having their whereabouts disclosed, and do not want to have correspondence carried on between the children, who are now their children by adoption, and the natural parents. Although the new parents are not before the court, manifestly they have rights worthy of consideration in analysis of the problem.

III.   At different times during the last year or two, appellees have demanded from appellant association information as to the whereabouts of the children. This information has been refused on the ground that the welfare of the children requires that they be not permitted to correspond or communicate with their parents. In the court below, the case was argued on the theory that it presented but one question: and that was the power of a court of equity to grant discovery of the whereabouts of the children, under the issues framed by the petition and demurrer. The order entered by the mayor of Sheldon was in accordance with the statutes, and regular in every respect. The jurisdiction of the mayor to make the order has never been questioned, and is not questioned in this proceeding. The order entered by the mayor conferred upon the appellant

association power to place the children in family homes for permanent adoption. The status of children such as are involved in the instant case is well established in this state. The state, by legislative enactment, has delegated to courts and magistrates the power to investigate complaints, and, for sufficient cause, to take children from their parents and commit them permanently to a society such as appellant society, for "placing out for adoption" such children as are here involved. Code Supplement, 1913, Sections 3260-d and 3260-b. The status and authority of appellant society are clearly defined in the above quoted Section 3260-b. It was clearly the intention of the legislature to empower societies such as appellant society not only to place unfortunate children in private homes, but also to perform the acts necessary to give rise to a new status,—that of foster parent and child,—a relation which, in its very nature, is permanent, and terminates parental relations between the child and his parents by blood. Manifestly, it was intended to absolutely terminate the relation between unworthy parents and their children, and to create new and permanent relations which would take their place. The established rule is that the welfare of the child shall prevail in all cases. It has now been nearly seven years since the order of the magistrate placed these children in the care and custody of appellant society, for placement in family homes. The petition admits the jurisdiction and regularity of the proceeding before the mayor. Such chapter especially contemplates that societies such as appellant, proceeding thereunder, should have power and authority to grant children by adoption. It is clear that the magistrate acted under our statutes, and committed these children to appellant society, giving to the society all the powers which their parents had ever possessed, including the right to give the children in adoption. The adjudication of the mayor was, in effect, a finding that the natural parents were unworthy, and was an exercise of the power of the state to take children from unworthy parents and place them in better surroundings. The state still has the power, as *parens patriæ*, through the courts, if the welfare of the children should so demand, to retake them and hand them back to their parents, or place them elsewhere. Such relief is not asked in the instant case.

IV.   Now, was the trial court justified, under the record, in entering the order directing appellant association to "divulge and make known to plaintiffs herein the present names, names of adopted and foster parents, if any, and the present residence and addresses of the said children of plaintiffs, * * * and that defendants permit and allow plaintiffs to communicate with said children, or with any of them, and to visit them, or any of them, at reasonable intervals?"

We cannot concur in the order of the learned trial court. Appellees pleaded, in effect, that they were adjudged to be delinquent to such an extent that their children were taken away from them.   They pleaded an adjudication that the children were "illtreated and neglected children."   They pleaded guilty to illtreatment and neglect of their children.   Appellees were deprived of their children by their own unworthiness.   The record does not disclose that appellees, in the intervening years, have reformed.   The presumption is that they are of the same character and disposition as formerly.   We would not say that unworthy parents should be deprived of communication with their children as a punishment for their acts in illtreating and neglecting their children.   Such thought cannot be indulged. The paramount question is the welfare of the childen and of all such unfortunate children.   The policy of appellant association is stated in the correspondence, made part of the petition, in the following language:

"We never go out seeking such children but when they are put upon our hands—thrust upon us—we consider first and foremost the welfare of the child, and it would not do at all to have the parents in direct correspondence with the children, or with others in the vicinity where the children live, or have them visiting the children.   It leads to one and the same thing—discontent, not only of the children, but those who are trying to do their best for them."

The record further discloses that the policy adopted by appellant of not disclosing the whereabouts of children placed with them is the rule generally followed by such societies.   While the rule adopted and insisted upon by appellants may seem harsh in some cases, we cannot doubt that it is a salutary one. We fear that to permit communication and visitation by the

natural parents with their children might destroy or materially interfere with discipline of the children by their foster parents. But there is a still more serious proposition involved, and that is one of general public policy in these matters, as affecting the welfare of such children. We fear that it will be difficult, and perhaps impossible, to find homes for such children as are concerned in this case, unless the foster parents are assured that the children are to become permanent members of their households, and that there will be no interference with their control and discipline of the children, and that nothing will occur, by interference by the natural parents or anyone else, that might produce discontent and restlessness on the part of the children. We are inclined to think that the beneficent purpose of our statutes enacted for the welfare of illtreated and neglected children would be defeated or sadly crippled if the privileges demanded by appellees, under the record before us, should be granted.

It is well known that home-finding societies, such as appellant, are organized and supported largely by benevolent men and women, to effect and carry out the family placement system; and we fear that such system would fail of efficiency if proper and salutary rules and regulations are interfered with. When the dire necessity occurs of taking children from their parents, the separation must be complete. It is not wholesome or proper that the children be controlled and disciplined or advised in any degree by two sets of parents. The policy of our state with respect to the welfare of such unfortunate children must not be interfered with, nor the welfare of such children sacrificed by sentimental considerations. We must not be understood to say that every separation of parents and children should be permanent. But when the state has intervened, and, through its courts and magistrates, has found it necessary to take children from their natural parents and place them in other homes, we think that this necessarily impels the breaking of all communication between natural parents and children until a change of custody, or the children have reached their majority.

The demurrer to the petition should have been sustained, and it was error to overrule it and to grant the prayer of the petition. Results in reversal of the decree and judgment of the

lower court. The cause is reversed and remanded, for proceeding, if desired, not inconsistent with this opinion.—*Reversed and remanded.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.